**John T. FOY, Respondent,**

v.

**J.E.K. INDUSTRIES, Relator,**

**Commissioner of Economic Security, Respondent.**

**No. C5–84–309.**

Court of Appeals of Minnesota.

July 31, 1984.

John T. Foy, pro se.

Eric J. Magnuson, Gary C. Edison, Rider, Bennett, Egan & Arundel, Minneapolis, for relator.

Hubert H. Humphrey, III, Atty. Gen., Laura E. Mattson, Sp. Asst. Atty. Gen., St. Paul, for respondent.

Heard, considered and decided by POPO-VICH, C.J., and LESLIE and CRIPPEN, JJ.

## OPINION

LESLIE, Judge.

This is an appeal by the relator, J.E.K. Industries, Inc., from a determination by the commissioner of economic security that the employee, John Foy, should be allowed unemployment benefits. We find that the commissioner's decision is unsupported by substantial evidence, and we therefore reverse.

## FACTS

The respondent, John Foy, was employed by J.E.K. Industries from May, 1970 until May 18, 1983. At the time he left his employment with J.E.K., Foy held the position of vice president in charge of sales and marketing. In 1972 Foy had purchased 5 percent of the stock of J.E.K., and the remaining 95 percent was owned by the president of the company. The employment contract between Foy and J.E.K. provided that Foy would receive an annual salary of $42,000, a bonus consisting of 5 percent of the net profits of J.E.K. before taxes, a monthly car allowance of $453 per month, and an "advance" of $250 per pay period, or $500 per month. In addition, Foy's employer, in accordance with an un-written agreement, paid Foy's country club dues of $170 per month.

Foy terminated his employment on May 18, 1983 and applied for unemployment compensation benefits, stating in his application that he "voluntarily quit [his] position because of irreconcilable differences with the owner." He further indicated that his benefit package had been cut by ap-proximately $850 per month and that he

had been denied a buy-sell agreement and a stock option by the president and owner of the company.

Foy's claim was originally denied by the claims deputy, who found that he had voluntarily quit due to job dissatisfaction. Foy appealed, and a split hearing was held by two referees at two locations. Following those hearings the claims deputy's decision was affirmed, and Foy again appealed. The commissioner's representative, upon review of the record, determined that the split hearing had not accorded the parties an opportunity to sufficiently develop the evidence, and remanded for further testimony. Upon remand, and after a consolidated hearing, the referee reversed the prior decision, determining that Foy had quit with good cause, due to a substantial reduction in income. J.E.K. appealed to the commissioner's representative, who issued additional findings of fact and affirmed the referee's decision. Specifically, the commissioner's representative determined that the contested buy-sell agreement concerned Foy as a stockholder and not as an employee, and was therefore immaterial. The commissioner's representative also noted that there was evidence of a personality conflict between Foy and his employer and possible misconduct by Foy, which would not constitute requisite good cause for quitting. The commissioner's representative concluded, however, that a "substantial" reason for Foy's decision to leave was a "sudden and drastic drop in income as of April 18, 1983." The commissioner found evidence that the "advances" and car allowances were part of Foy's base salary of $42,000.00 and that, along with the discontinuance of the $170.00 per month payment for his country club dues, Foy had lost 31 percent of his income. J.E.K. has appealed that determination.

## ISSUE

Is there sufficient evidence in the record to support the commissioner's determination that Foy involuntarily discontinued his employment due to a sudden decrease in income?

## ANALYSIS

The scope of review of the commissioner's decision is limited:

The narrow standard of review requires that findings be reviewed in the light most favorable to the decision, and if there is evidence reasonably tending to sustain them, they will not be disturbed.

*Group Health Plan, Inc. v. Lopez,* 341 N.W.2d 294, 296 (Minn.App.1983), quoting from *White v. Metropolitan Medical Center,* 332 N.W.2d 25, 26 (Minn.1983). Nonetheless, "[p]ublic policy dictates unemployment compensation benefits extend only to those who are involuntarily unemployed through no fault of their own." *White,* 332 N.W.2d at 26. In this instance although there is some evidence that Foy's income was reduced, the overwhelming evidence indicates that he voluntarily terminated his employment simply because he was unhappy with his relationship with the company's owner and with the owner's refusal to offer him a buy-sell agreement.

The Minnesota Supreme Court has indicated that a wage cut of 21–26 percent constitutes the requisite "good cause" for an employee to resign and to qualify for unemployment compensation benefits. *Sunstar Foods, Inc. v. Uhlendorf,* 310 N.W.2d 80 (Minn.1981); *Scott v. The Photo Center,* 306 Minn. 535, 235 N.W.2d 616 (1975). In this instance the commissioner determined that the car allowances of $453.00 per month constituted 13 percent of Foy's annual income of $42,000.00, that the "advances" of $500.00 per month constituted 14 percent of his income, and that the $170.00 per month country club dues constituted a 4 percent loss in income. When added together, the commissioner concluded that these losses constituted a decrease in 31 percent of Foy's income.

Although the commissioner's determination that Foy's car allowances constituted 13 percent of his $42,000.00 annual salary is supported by the record, there is absolutely no evidence to support the commissioner's conclusion that the $500 per month "advances" to Foy were also a part of his

annual salary. No pay stubs, accounting ledgers, worksheets or other documents were submitted to substantiate Foy's testimony that the "advances" were part of his salary, rather than advances on his year-end bonus. Contrary to Foy's allegation, the employment contract between the parties specifically referred to these "advances" as payments against any bonus received due to profits. In addition, as the commissioner's representative himself specifically found, the advances were "offset against the annual bonus to reduce the 5 percent bonus by such amounts." The evidence demonstrates that between 1981 and 1983 J.E.K. experienced financial difficulty, and in 1982 and 1983 the amount of Foy's advances exceeded his profit share. Accordingly, if there were no profits, Foy was not entitled to continue to receive these advances against profits.

The commissioner's conclusion that Foy's salary was reduced by 31 percent is therefore unsupported by the record. Further, as indicated above, the testimony and evidence which was submitted clearly demonstrates that Foy resigned not over this alleged decrease in his salary, but because he was unhappy with his employer and wished to start a new company. On May 25, 1983, shortly after he resigned, Foy noted in a letter to his employer:

> Jim,
>
> Regarding unemployment. The Hopkins office would not except (sic) my initial reason for leaving JEK Ind., "Too many differences with owner.["] I added reasons for leaving that effected (sic) me financially as requested by interview. This was *not* my choice. Please understand.
>
> John

(Emphasis in original.) In addition, immediately after he resigned, Foy attempted to set up a competing business, and sent letters concerning the history of the company to dealers asking them to do business with him, rather than with J.E.K. In those letters Foy indicated that he left J.E.K. to form another company because the president of J.E.K. knew very little about the business. A secretary for J.E.K. submitted a written statement indicating that she had typed these documents while Foy was still employed with J.E.K. This evidence, in addition to Foy's testimony submitted at the hearings on this matter, indicates without question that Foy left the company to start his own business because he had for some time been dissatisfied and frustrated with his employer.

## DECISION

Although there is evidence of a 13 percent reduction in Foy's wages, the commissioner's determination that Foy involuntarily terminated his employment due to a wage decrease of 31 percent is unsupported by the record. Rather, the only conclusion which the evidence would reasonably tend to support is that Foy voluntarily terminated his employment because he was dissatisfied with his employer, and because his employer refused to offer him a buy-sell agreement.

The commissioner's decision is reversed.